UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TATIANA SWIDERSKI,

                              Plaintiff,

            -v-

URBAN OUTFITTERS, INC.,

                              Defendant.

14-CV-6307 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Tatiana Swiderski brings this action against Defendant Urban Outfitters, Inc.,
her former employer.  She claims that Urban Outfitters unlawfully discriminated against her,
retaliated against her, and constructively discharged her from employment in violation of the
New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107, and the New
York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296.  Urban Outfitters moves
for summary judgment.  For the reasons that follow, the motion is granted in part and denied in
part.

I.      Background

The following facts are taken from the parties' statements of undisputed facts and are not
subject to a genuine dispute except where otherwise noted.

Swiderski was hired as a sales associate at Urban Outfitters in 2013, beginning work at an
Urban Outfitters store located at 521 Fifth Avenue in Manhattan ("the Store").  (Dkt. No. 71-1
("Pl.'s CSOF") ¶ 1.)  Her job was to "ensure customer satisfaction by helping customers and
making sure that they felt welcome at the store."  (*Id.* ¶ 7.)

A.      The First Incident

On November 1, 2013, Brian McCabe, a loss prevention agent employed by Defendant,
caught a male customer ("the First Customer") photographing or videotaping up Swiderski's

skirt while she was on the stairs.  (*Id.* ¶ 25.)  The First Customer also photographed or videotaped Brooke Becker, another female sales associate, as well as certain unidentified customers.  (*Id.* at ¶ 27.)  McCabe confronted the First Customer and escorted him to the back of the Store, where he seized the First Customer's cell phone and deleted all the pictures and videos of Plaintiff, Becker, and the customers.  (*Id.* ¶ 28.)[1]

McCabe then told Becker and Plaintiff what had happened, and assured them that Urban Outfitters would do everything it could and that they should not worry.  (*Id.* ¶ 31.)  McCabe also purportedly circulated an email to "all of the Urban Outfitters" with a picture of the First Customer and his identification information to prevent him from returning to the store, although Plaintiff disputes whether such an email was actually circulated.  (*Id.* ¶ 29; Dkt. No. 71-12, at 3.) McCabe also initially told Plaintiff that he would give her the First Customer's identification information so that she could file a police report, but Plaintiff testified that McCabe later refused to provide this information to her.  (Pl.'s CSOF ¶¶ 33, 39, 42.)  McCabe eventually received a "written warning" for mishandling this incident.  (Dkt. No. 71-14 at 90–91.)

Plaintiff also discussed the incident that day with Chris Morris, the Store Manager.  She testified that he responded: "you're a girl in New York . . . things happen; it's your responsibility to watch out for yourself."  (Dkt. No. 69-1 at 69.)  Defendant disputes whether Morris made such statements.  (Pl.'s CSOF ¶ 41; Dkt. No. 71-5 at 44.)  On November 11, 2017, in an e-mail to McCabe and another individual, Morris explained that Plaintiff wanted to call the police about the incident and that he was "not sure what to do in this situation."  (Pl.'s CSOF 134; Dkt. No. 71-13.)  Plaintiff also testified that, a few weeks after the first incident, she accidentally bumped

---

[1]     While Defendant maintains that McCabe "immediately confronted" the offending patron (Pl.'s CSOF ¶ 28), Plaintiff testified that McCabe watched him "for about an hour" before confronting him.  (*Id.*; Dkt. No. 69-1 at 38:3.)

into Morris, who looked her "up and down and said, you never have to be sorry for that." (Dkt. No. 69-1 at 247–48.)

On the day of the first incident, Plaintiff also discussed it with Anna Mella, the Assistant Store Manager. (Pl.'s CSOF ¶ 138; Dkt. No. 69-1, at 74–75.) During that conversation, Mella and others told Plaintiff that they were "fully aware of at least one man that used to come in regularly and sit under the stairs, . . . and look up dresses." (Dkt. No. 69-1, at 74–75.) Emily McManus, Manager of the Women's Department at the Store, also testified that she was aware of a "customer that came in sometimes . . . [and] look[ed] up the [skirts of] girls walking up the stairs." (Dkt. No. 71-3, at 26.)

Plaintiff also complained to McManus about the first incident several times. (Pl.'s CSOF ¶ 143; Dkt. No. 71-3, at 61; Dkt. No. 69-1, at 179.) During one such conversation with McManus (which Plaintiff apparently recorded), McManus stated that she was not aware of any company policy for dealing with customer harassment. (Pl.'s CSOF ¶ 51; Dkt. No. 69-1 at 116.)

After this incident, Plaintiff's working relationship with McCabe deteriorated. He assured Plaintiff that he had tried to do the right thing, and asked her to drop the issue because he was in trouble for not handling it properly. (Pl.'s CSOF ¶ 43.) Plaintiff testified that he later approached her again, this time more aggressively, until she was "against the back wall of a cash register," and told her to "drop things" because she "had stirred up a bit of questioning." (*Id.* ¶ 45.) She further testified that McCabe reported that he was told "he handled the whole situation [regarding the First Incident] incorrectly," and that he invaded her personal space, while staring "right into [her] eyes" and "whispering through his teeth in an aggressive manner" that he would "not be there to help her." (*Id.* ¶ 46.) He also called her a "stupid bitch." (*Id.*)

Plaintiff complained to McManus about McCabe's conduct. (*Id.* ¶ 47.) Plaintiff also repeatedly complained to Urban Outfitters employees, including Morris and McManus, that the police had not been contacted regarding the First Incident. (*Id.* at ¶ 54.) Eventually, Morris provided Plaintiff with the First Customer's information, and she filed a police report. (*Id.* ¶¶ 55, 57.)

After she filed the report, Plaintiff's interactions with McCabe continued to worsen. Per company policy, all employees are "screened" upon leaving a store to prevent theft of merchandise. (*Id.* ¶ 60.) Plaintiff testified that, after she filed the police report, McCabe "would always be the person to screen her when she left the store." (*Id.* ¶ 61.) She further testified that, on at least four occasions, McCabe's screening involved "really invasive patdowns," during which he "reach[ed] into [her] jacket," "touch[ed] [her] sides and [her] waist, and "touch[ed] the sides of [her] hips," despite the fact that company protocol prohibited physically touching employees during such screenings. (*Id.* ¶ 62, 65.) Defendant disputes that McCabe ever violated the protocol prohibiting physical touching during screenings. (*Id.* ¶ 62.)

### B. The Second Incident

In November 2013, Plaintiff was the victim of a second instance of customer harassment. As she was escorting a male customer to the men's department, he "reach[ed] for [her] face," tried to "put both of his thumbs into [her] mouth," said he "wanted to see her teeth," and licked her cheek. (Pl.'s CSOF ¶ 83.) When Plaintiff pulled away from him, the customer tried to grab her chest and the front of her dress, at which point she ran to the back room of the Store. (*Id.* at ¶ 85; Dkt. 69-1, at 218.) She told a male employee what happened, and that employee, along with a security guard, removed the offending customer from the store. (Pl's CSOF ¶ 86.) Plaintiff later reported the second incident to Mella and to Gabriel Tolito, a support manager in

the women's department.  (*Id.* at ¶ 88; Dkt. No. 71-4 at 32.)  Defendant did not call the police after the second incident.  (*Id.* ¶ 90.)

## C.    Retaliation Allegations

As noted above, Plaintiff complained to her superiors about how Urban Outfitters handled the first incident. (*E.g.*, *id.* ¶ 47.)  After she complained, management placed Plaintiff in the back stock room of the Store and "assigned [her] tasks for which she had no formal training," including "manning the stock room, the register, and the women's accessories department."  (*Id.* ¶¶ 68–69.)  Plaintiff testified that, prior to complaining about the customer harassment, she had never been assigned to work in the "back stock."  (*Id.* ¶ 173; Dkt. 69-1 at 126–27.)  She alleges that, on one occasion, when she complained about being assigned to the stock room, she was told to "stop complaining because '[a]t least now people can't molest you.'"  (Dkt. No. 71-1 at 176.)  Moreover, Plaintiff testified that she was denied breaks at least twice, and that after she complained, her relationship with management employees, such as Tolito, deteriorated, and she no longer received "positive feedback."  (Pls. CSOF ¶ 73.)

Plaintiff was also assigned to work a weekly late-night shift after the second incident.  (*Id.* ¶ 92.)  The parties dispute whether all employees at the Store were required to work one night shift a week: Plaintiff testified that no other employees were asked to work a late shift, while Urban Outfitters maintains that "[e]veryone at Urban Outfitters was required to work one night shift a week."  (*Id.* ¶¶ 93, 98; Dkt. 69-1 at 226–27.)  After the second incident, Plaintiff asked that she not be scheduled to work night shifts, but Defendant denied that request.  (*Id.* ¶ 95.)  Ultimately, Plaintiff quit her job.  She testified that she was prompted to quit in part because she would "have to walk through . . . the street, the park, the subway at potentially 2:00 [or] 3:00 in the morning."  (*Id.* ¶ 76, 78.)

In 2014, Plaintiff filed this suit against Defendant, alleging employment discrimination and retaliation under state and municipal law.[2]  Later that year, the Court denied Defendant's motion to dismiss for failure to state a claim.  *Swiderski v. Urban Outfitters, Inc.*, No. 14 Civ. 6307, 2015 WL 3513088 (S.D.N.Y. June 4, 2015).  In March 2017, Defendant filed this motion for summary judgment.

## II.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is material if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986), and a dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party, *see Ricci v. DeStefano,* 557 U.S. 557, 586 (2009).

The movant's initial burden on summary judgment is to provide evidence on each element of his claim or defense illustrating his entitlement to relief.  *Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir. 2004).  If the movant makes this showing, the burden shifts to the non-movant to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ over the evidence.  Fed. R. Civ. P. 56(f); *Anderson,* 447 U.S. at 250–51.  The court should view all evidence "in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor," and a motion for summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).  At the same time, the non-moving

---

[2] The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because Swiderski, a citizen of New York State, is suing Urban Outfitters, a Pennsylvania corporation whose principal place of business is in Pennsylvania, for more than $75,000.

party cannot rely upon mere "conclusory statements, conjecture, or speculation" to meet its

burden. *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. Discussion

Defendant moves for summary judgment on Plaintiff's sex-discrimination claims, which

are based on a hostile work environment theory, her retaliation claims, and her constructive-

discharge claims. Each is discussed in turn.

### A. Hostile Work Environment Claim

Plaintiff claims that Defendant discriminated against her on the basis of sex in violation

of state and municipal law by subjecting her to a hostile work environment.[3] *See Torres v.*

*Pisano*, 116 F.3d 625, 630 (2d Cir. 1997) ("It is now accepted that [Title VII and the NYSHRL]

. . . 'strike at the entire spectrum of disparate treatment of men and women in employment' and

. . . 'forbid sexual harassment in the workplace.'") (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S.

17, 21 (1993)). Under New York State law, "[i]n order to prevail on a hostile work environment

claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment ["hostile environment" element] and (2) that there is a specific basis for imputing

the conduct creating the hostile work environment to the employer ["imputation" element]."

*Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (quoting *Duch v. Jakubek*, 588 F.3d

_____

[3]    Defendant argues that Plaintiff has failed to establish a prima facie case of gender discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 794 (1973). The *McDonnell Douglas* burden-shifting framework applies to discrimination claims alleging an adverse employment action on the basis of a protected characteristic. It does not apply, however, where, as here, a plaintiff alleges discrimination resulting from a hostile work environment. *See, e.g.*, *Goldschmidt v. New York State Affordable Hous. Corp.*, 380 F. Supp. 2d 303, 311 (S.D.N.Y. 2005). Accordingly, the Court need not address the arguments based on *McDonnell Douglas*.

757, 762 (2d Cir. 2009) (quotation marks omitted).[4]  "Finally, it is 'axiomatic' that in order to

establish a sex-based hostile work environment . . . , a plaintiff must demonstrate that the

conduct occurred because of her sex."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)

(quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).[5]

The NYCHRL, however, "was intended to be more protective than the state and federal

counterpart[s]." *Selmanovic v. NYSE Grp., Inc.*, No. 06 Civ. 3046, 2007 WL 4563431, at *4

(S.D.N.Y. Dec. 21, 2007) (citing *Farrugia v. North Shore Univ. Hosp.*, 820 N.Y.S.2d 718 (N.Y.

Sup. Ct. 2006)).  Accordingly, Plaintiff's burden is lower under city law with respect to the first

element of her hostile work environment claim.  Under city law, unlike under state and federal

law, a plaintiff need not necessarily "show that the harassment was sufficiently severe or

pervasive to alter the conditions of employment and create an abusive working environment,"

*Selmanovic*, 2007 WL 4563431, at *4, but instead must show only "unwanted gender-based

conduct." *Erasmus v. Deutsche Bank Americas Holding Corp.*, No. 15 Civ. 1398, 2015 WL

7736554, at *7 (S.D.N.Y. Nov. 30, 2015) (quoting *Anderson v. N.Y.C. Hous. Auth.*, 872

N.Y.S.2d 27, 38 (App. Div. 1st Dep't 2009)).  "[L]iability [under city law] should be determined

by the existence of unequal treatment and questions of severity and frequency reserved for

consideration of damages." *Selmanovic*, 2007 WL 4563431, at *4.

### 1.    Hostile Environment Element

First, the Court considers whether Plaintiff has satisfied her burden of production with

respect to the hostile environment element of her claim.  To survive summary judgment with

---

[4]     "Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard." *Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013) (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)).

[5]     With respect to the alleged customer harassment, Defendant does not appear to challenge the nexus between Plaintiff's sex and the customers' misconduct.

respect to this first element under state law, "a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (internal quotation marks omitted)). "In considering whether a plaintiff has met this burden, courts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Id.* (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (internal quotation marks and brackets omitted)). Not only must the victim "subjectively perceive that environment to be abusive," but the work environment must also be "objectively hostile or abusive" as a result of the misconduct in question. *Id.* (quoting *Alfano,* 294 F.3d at 374).

Defendant contends that Plaintiff has failed to produce sufficient evidence that the two incidents of customer harassment were either sufficiently severe or pervasive to alter the conditions of the her employment and thereby create an abusive working environment. (Dkt. No. 72 at 1–2.) Plaintiff responds that (1) the two incidents were sufficiently "severe" to constitute a hostile environment under state law, even if the harassment was not "pervasive; and (2) her evidence is also sufficient to satisfy the "more liberal NYCHRL" standard. (Dkt. No. 71 at 9–10.) The Court agrees that the evidence gives rise to a genuine issue of fact as to whether the two incidents of customer harassment were sufficiently severe to constitute a hostile environment under both state and city law.

Both parties acknowledge that "a plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphasis in original). Although, as a "general rule," "[i]solated acts, unless very serious, do not meet the threshold of severity or pervasiveness[,] . . . it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374 (2d Cir. 2002) (citations omitted).

A single act will satisfy this requirement, however, only if it is "extraordinarily severe." *Id.* "[I]ntimate or . . . crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the buttocks—may be considered insufficiently abusive to be described as 'severe' when they occur in isolation . . . But *when the physical contact surpasses what (if it were consensual) might be expected between friendly coworkers . . . it becomes increasingly difficult to write the conduct off as a pedestrian annoyance*." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 177 (2d Cir. 2012) (emphasis in original) (quoting *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006)). "Direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment." *Id.* In *Reid v. Ingerman Smith LLP*, for example, the court concluded that a single incident during which a supervisor, "after looking at [plaintiff's] breast and exclaiming 'those things are huge,' . . . 'grabbed and squeezed' one of [her] breasts" was sufficiently severe to constitute a hostile environment. 876 F. Supp. 2d 176, 185 (E.D.N.Y. 2012).

Similarly, in the present case, taking the facts in the light most favorable to Plaintiff and resolving any disputes in her favor, the second incident alone was sufficiently severe to alter the conditions of her employment. A customer "reach[ed] for [her] face," tried to "put both of his

thumbs into [her] mouth," and then licked her cheek.  (Pl.'s CSOF ¶ 83.)  When Plaintiff pulled

away from him, the customer attempted to grab her chest and the front of her dress.  (*Id.* at ¶ 85;

Dkt. 69-1, at 218.)  This direct contact with Plaintiff's intimate body parts is sufficiently severe

by itself to create a hostile environment, *see Redd*, 678 F.3d at 180, but this was not the only

instance of severe harassment that Plaintiff experienced: during the first incident, a male

customer followed her around the store and took photographs and videos up her skirt without her

knowledge.  *Cf. Tompkins v. Allied Barton Sec. Servs.*, No. 09 Civ. 1954, 2010 WL 3582627, at

*9 (S.D.N.Y. Aug. 2, 2010) ("[T]he taking of a single photograph while Plaintiff slept . . . cannot

be considered severe."), *report and recommendation adopted*, No. 09 Civ. 1954, 2010 WL

3582621 (S.D.N.Y. Sept. 13, 2010), *aff'd*, 424 F. App'x 42 (2d Cir. 2011).

        In addition to these incidents of customer harassment, Plaintiff claims that McCabe's

aggressive conduct exacerbated the conditions of her employment.  (Dkt. No. 71 at 17–19.)

Defendant characterizes McCabe's conduct as "isolated incidents of little to no consequence"

that neither "involve[d] a change in the terms or conditions of Plaintiff's employment" nor bore a

causal connection to her sex.  (Dkt. No. 68 at 8, 11.)  The Court is not persuaded by this

characterization of McCabe's conduct.[6]

_____

        [6]      Plaintiff also argues that Morris' conduct likewise contributed to the creation of a
hostile work environment.  (Dkt. No. 71 at 17.)  The Court, however, agrees with Defendant that
his comments were insufficiently severe or pervasive to constitute sexual harassment, even if
they were inappropriate and insensitive.  After the first incident, he allegedly told Plaintiff, "It's
a big city and you're a pretty girl. What did you expect?"  (*Id.* at 20.)  On another occasion, when
Plaintiff accidentally bumped into Morris, he looked her up and down and said, "You never have
to be sorry for bumping into me like that."  (*Id.*)  These two comments do not constitute severe
or pervasive sexual harassment.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68
(2006) ("Title VII . . . does not set forth a general civility code for the American workplace.")
(quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998); *Faragher v. City of
Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]tandards for judging hostility" must "filter out
complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of

Viewed in the light most favorable to Plaintiff and with all reasonable inferences drawn in her favor, McCabe's aggressive conduct amounted to sexual harassment under the law of this circuit. Specifically, after the first incident, McCabe approached Plaintiff until she was "against the back wall of a cash register," called her a "stupid bitch," and invaded her "personal space," while staring "right into her eyes" and "whispering through his teeth in an aggressive manner" that he would not be there to help her next time." (Pl.'s CSOF ¶ 46.)[7] The Second Circuit has previously determined that evidence of similar conduct is sufficient to satisfy a plaintiff's burden on summary judgment to establish existence of a hostile work environment. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir. 2000) ("[Supervisor] would stand very close to women when talking to them and would 'look at them up and down in a way that's very uncomfortable. On these occasions, [plaintiff] testified, [supervisor] would move increasingly close to her, 'so usually if there is a wall I end up against the wall talking to him.'" (some brackets omitted)), *superseded on other grounds by* N.Y.C. Local L. No. 85.[8] Furthermore, Plaintiff testified that, on at least four occasions, McCabe subjected her to "really invasive patdowns," during which he

---

abusive language, gender-related jokes, and occasional teasing.'") (quoting B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992)).

[7] Defendant correctly points out that "the use of the word 'bitch'"does not always and in every context" reflect sex-based animus, but "that its usage [must] be viewed in context." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010). Considering the totality of the circumstances, including McCabe's reference to the first incident of sex-based customer harassment, the Court concludes that there is sufficient evidence connecting his aggressive conduct to Plaintiff's sex for purposes of summary judgment. *See Alfano*, 294 F.3d at 374 (2d Cir. 2002).

[8] Defendant attempts to distinguish *Cruz* based on the fact that McCabe, unlike the offender in *Cruz*, was not Plaintiff's supervisor. That fact, however, is relevant only to the imputation element of her claim and has nothing to do with the severity or pervasiveness of the harassment to which Plaintiff was exposed. *See, e.g., Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) ("An employer is subject to *vicarious liability* to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.") (emphasis added).

"reach[ed] into [her] jacket," "touch[ed] [her] sides and [her] waist, and "touch[ed] the sides of [her] hips," even though company protocol prohibited physically touching employees during screenings. (Pl.'s CSOF. ¶¶ 62, 65.) These repeated instances of unwanted physical contact further aggravated the hostile nature of Plaintiff's working conditions. *See, e.g.*, *Redd*, 678 F.3d at 180; *cf. Lucas v. S. Nassau Communities Hosp.*, 54 F. Supp. 2d 141, 147 (E.D.N.Y. 1998) (holding that physical contact did not constitute sexual harassment as a matter of law where supervisor (1) "allegedly brushed up against plaintiff on three remembered occasions" (2) "[supervisor's] hand also allegedly touched [plaintiff] on three remembered occasions"; and (3) "[supervisor's] hand allegedly touched plaintiff's back or shoulder briefly on five to seven other unidentified occasions").

In sum, based on the totality of the circumstances, Plaintiff has satisfied her burden to establish that she was subjected to harassment, and that this harassment was sufficiently severe or pervasive to create a hostile work environment.[9]

### 2. Imputation

Having determined that Plaintiff has raised a genuine factual dispute as to whether the harassment of the customers, both alone and in combination with McCabe's aggressive conduct, rendered her work environment hostile, the Court next must consider whether Plaintiff has met her burden to establish that the harassing conduct may be imputed to Defendant.

"Generally, Title VII actions and claims arising under the state and local laws are evaluated identically. However, courts have applied a stricter standard under the state and local human rights laws with regard to the imputation of liability to an employer. . . ." *Int'l*

---

[9] Because the evidence is sufficient to establish a genuine factual dispute as to actionable harassment under the NYSHRL, it is sufficient *a fortiori* to survive summary judgment under the more lenient standard of the NYCHRL.

*Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007) (internal citation omitted).  Under the NYCHRL, an employer is liable for discriminatory behavior by an employee only if:

> (1) the employee or agent exercised managerial or supervisory responsibility; or
>
> (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where the conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or
>
> (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

N.Y. City Admin. Code § 8-107(13)(b).  The NYSHRL applies an even stricter standard, precluding imputation "unless the employer became a party to it by encouraging, condoning, or approving it."  *Erasmus*, 2015 WL 7736554, at *8 n.14 (quoting *Forrest v. Jewish Guild for the Blind et al.*, 3 N.Y.3d 295, 311 (2004)).  "Condonation . . . contemplates a knowing, after-the-fact forgiveness or acceptance of an offense."  *State Div. of Human Rights ex rel. Greene v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687 (1985).  On one hand, "[a]n employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation."  *Id.*  On the other hand, "[c]ondonation may be disproved by a showing that the employer reasonably investigated a complaint . . . and took corrective action."  *Selmanovic*, No. 06 Civ. 3046, 2007 WL 4563431, at *4 (S.D.N.Y. Dec. 21, 2007) (quoting *Father Belle Cmty. Ctr. v. New York State Div. of Human Rights*, 642 N.Y.S.2d 739 (App. Div. 4th Dep't 1996)).

### a.    Customer Harassment under NYCHRL

With respect to customer harassment, it is well established in this circuit that courts "imput[e] employer liability for harassment by non-employees according to the same standards

for non-supervisory co-workers, with the qualification that [they] will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees." *Summa*, 708 F.3d at 124 (quoting 29 C.F.R. § 1604.11(e) (internal quotation marks omitted).

Defendant relies on *Summa* to argue that it "cannot be held liable" for either incident of customer harassment, "absent a showing that [it] permitted the harassment to continue past the point in time where it knew or should have known such harassment was taking place yet failed to act." (Dkt. No. 68 at 4–5.) Defendant maintains that it took effective remedial action immediately upon learning of each customer's misconduct. After the first incident, McCabe "confronted and detained the customer," deleted his unconsenual photographs and videos, and "ejected him from the store." (*Id.* at 5.) Regarding the second incident, as soon as Plaintiff informed a coworker what occurred, the offending customer was "swiftly ejected from the store." (*Id.* at 5.)

Defendant's argument, however, fails to account for the entire scope of an employer's duty to take appropriate corrective action under the NYCHRL and *Summa*. Once it has notice that its employees are being harassed, an employer's remedial obligation is not necessarily satisfied by ejecting the offending customer from the store: "appropriate corrective action" under the NYCHRL may also entail "proactive steps."[10] N.Y. City Admin. Code § 8-107(13)(b); *Summa*, 708 F.3d at 125. In *Summa*, for example, in response to a student-manager's complaints of sexual harassment by some players on the football team, the defendant-university "had the

---

[10] The Court also notes that a factual dispute exists as to how long it took Urban Outfitters to respond to the first incident: Defendant maintains that McCabe "immediately confronted" the offending patron (Pl.'s CSOF ¶ 28), but Plaintiff testified that McCabe watched him "for about an hour" before taking remedial action. (*Id.*; Dkt. No. 69-1 at 38.)

entire Athletics staff undergo sexual harassment training before the start of the next football season." *Id.* The fact that the university not only "prompt[ly] respon[ded] to the particular incidents of harassment" by the players, but also took these "proactive steps to create a better environment for all employees in the future" was relevant to the court's determination that the university had taken appropriate remedial action as a matter of law. In contrast, the court in *Creacy v. BCBG Max Azria Grp., LLC*, determined that a factual dispute existed as to whether the employer had taken adequate remedial action, in part because that employer neither "undertook any investigation into . . . incidents" of customer harassment, nor "trained its employees in proper harassment procedures and corrective actions," nor sought "a trespass warning" against the harassing customer. No. 14 Civ. 10008, 2017 WL 1216580, at *11 (S.D.N.Y. Mar. 31, 2017).

This case is more like *Creacy* than *Summa*. Here, a genuine factual dispute exists as to whether Defendant took appropriate corrective action to address each incident of customer harassment once it had notice of the problem. Although ejection of each offending customer was likely *necessary* to meet Defendant's remedial obligations, it was not, as a matter of law, *sufficient* in and of itself. Unlike in *Summa*, there is no evidence here that Defendant took any "proactive steps" to prevent future harassment nor instituted any training for its employees on how to deal with such incidents. Moreover, there is no indication that Defendant undertook any investigation about either incident or issued a "trespass warning" regarding either offending customer, despite the fact that Plaintiff complained to several management employees about both incidents.[11] *Cf. Creacy*, 2017 WL 1216580, at 11. Furthermore, Defendant concedes that it did

---

[11] In fact, at least as to the first incident, McManus apparently confirmed to Plaintiff that the offending customer's identification was never circulated to management or the employees of the Store. (Dkt. No. 71-11 at 3.)

not have any specific written policy concerning the handling of customer harassment incidents, as it apparently believed that "such a specific policy is not needed." (Dkt. No. 72 at 3.) Even Morris, the Store Manager, was "not sure what to do in [such] situation[s]," where a customer harasses an employee and she wants to contact the police. (Pl.'s CSOF 134; Dkt. No. 71-13.) A reasonable jury could conclude that Defendant's lack of a policy was negligent, and that it contributed to a failure to take reasonable corrective action to deal with these incidents of customer harassment.

Defendant contends that it had no advance notice about each incident of customer harassment, and that the law does not require it to take "preventative action." (Dkt. No. 72 at 4.) Defendant is correct that its legal duties regarding customer harassment depend in part on whether it was on notice. In determining the extent of an employer's remedial obligation regarding incidents of customer harassment, the Court must first "consider[] the extent of [the employer's] control of the location and its legal responsibilities with respect to the conduct of customers." *Creacy*, 2017 WL 1216580, at *10 (citing *Summa*, 708 F.3d at 124.) And as this Court has previously explained, "[c]ontrol, in the context of a retail establishment and an offending customer, is assessed based on the retailer's knowledge of the customer's prior behavior—thus, generally, an employer is not liable for failing to prevent an act of harassment by a first-time customer." *Swiderski*, 2015 WL 3513088, at *3.

Here, however, Defendant's argument omits important context: even before the first incident, management was aware that customers came into the store and tried to look up the skirts of female employees. (Dkt. No. 69-1, at 74–75; Pl.'s CSOF ¶ 139; Dkt. No. 71-3, at 26.) This constitutes notice under the NYCHRL: "an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where the conduct was known by another

employee or agent who exercised managerial or supervisory responsibility." N.Y. City Admin. Code § 8–107(13)(b)(2). Where, as here, the circumstances indicate an employer's awareness of potentially widespread customer harassment, courts have concluded that mere *reactive* action, when unaccompanied by *proactive* measures, is insufficient to constitute adequate corrective action as a matter of law. *See E.E.O.C. v. Love's Travel Stops & Country Stores, Inc.*, 677 F. Supp. 2d 1176, 1183 (D. Ariz. 2009) ("Defendant's liability does not turn on whether it knew of the harassment before or after it occurred, but on whether it took adequate remedial action once it was given notice that its female cashiers were being regularly sexually harassed by customers.").

Because a genuine factual dispute remains as to whether the Defendant "failed to take immediate and appropriate corrective action" once it "knew of the [customer's] discriminatory conduct, N.Y. City Admin. Code § 8–107(13)(b)(2), a reasonable jury could conclude that the conduct may be imputed to Defendant under NYCHRL.

### b. Customer Harassment under NYSHRL

Under the stricter NYSHRL standard, the customers' conduct cannot be imputed to Defendant. Under state law, imputation requires "a showing that the employer became a party to the discriminatory conduct" by "encourag[ing], condon[ing], or approv[ing] of the conduct." *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007); *see also St. Elizabeth's Hosp.*, 66 N.Y.2d at 687 ("Condonation . . . contemplates a knowing, after-the-fact forgiveness or acceptance of an offense."). "Furthermore, condonation requires actual notice." *Int'l Healthcare Exch.*, 470 F. Supp. 2d at 361 (citing *St. Elizabeth's Hosp.*, 66 N.Y.2d at 687).

In *Totem Taxi Inc. v. New York State Human Rights Appeal Board*, perhaps the seminal case on NYSHRL imputation, the New York Court of Appeals held that "it cannot be rationally concluded under the [NYSHRL] that an employer has been guilty of discrimination whenever any employee at any level commits, . . . a disapproved and unanticipated discriminatory act." 65 N.Y.2d 300, 305 (1985). The court held that the employer, a taxicab company, was not liable for the discriminatory act of one of its drivers because it "had adopted an antidiscrimination policy before this isolated incident occurred, and when the president of the company learned of it he immediately apologized and suspended the offending driver." *Id.* Similarly, in the present case, the record does not permit the conclusion that Defendant "became party to the discriminatory conduct" of the two offending customers. *Int'l Healthcare Exch.*, 470 F. Supp. 2d at 361. The undisputed facts show that in both instances, each customer was ejected from the store once Defendant had notice of his conduct. Because Defendant did not encourage, condone, or approve of the customers' conduct, it cannot be held liable under the NYSHRL, and Defendant is entitled to summary judgment on this state law discrimination claim.

c.      **Employee Harassment under the NYCHRL and NYSHRL**

Next, the Court considers whether McCabe's harassment can be imputed to Defendant under the same city and state law standards.

First, under the NYCHRL, a genuine factual dispute remains as to whether McCabe's aggressive conduct can be imputed to Defendant. Plaintiff complained to McManus—the manager of the women's department—about McCabe's aggressive conduct after the first incident. (*Id.* ¶ 47.) Under the NYCHRL, this suffices to establish notice. *See* N.Y. City Admin. Code § 8–107(13)(b)(2). Despite being on notice of McCabe's conduct, McManus neither reported Plaintiff's complaint to anyone else nor took any meaningful action herself.

(Dkt. No. 71-3 at 82.)  At the very least, this failure to act by a Store manager amounts to a failure to take "immediate and appropriate corrective action" to address McCabe's harassing conduct.  *See* N.Y. City Admin. Code § 8-107(13)(b).  Consequently, his conduct can be imputed to Defendant under the NYCHRL.

Second, even under the stricter NYSHRL standard, a genuine factual dispute exists as to whether McCabe's conduct can be imputed to Defendant.  As explained above, imputation under NYSHRL requires actual notice and condonation.  Yet condonation does not require the employer's affirmative endorsement of the offending action: "An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation."  *St. Elizabeth's Hosp.*, 66 N.Y.2d at 687.  Again, the evidence in the record supports a finding that Defendant was on notice of McCabe's offensive conduct after Plaintiff complained to McManus, yet McManus neither took action nor initiated an investigation in response.  *Cf. Father Belle Cmty. Ctr.*, 642 N.Y.S.2d at 746 ("Condonation may be disproved by a showing that the employer *reasonably investigated* a complaint of discriminatory conduct and took corrective action." (emphasis added)).  Here, despite the fact that it apparently took no action in response to Plaintiff's complaints, Defendant offers no reason why McCabe's conduct cannot be imputed to it as a matter of law, beyond its conclusory assertion that it "neither encouraged, nor condoned, nor approved of [it]."  (Dkt. No. 68 at 11; Dkt. No. 72 at 5.)  The motion for summary judgment as to Defendant's liability for McCabe's conduct is therefore denied.

### B.    Retaliation Claims

Plaintiff also claims that Defendant retaliated against her in violation of the NYSHRL and the NYCHRL after she complained about its handling of the customer harassment incidents and McCabe's aggressive conduct.  (Dkt. No. 71 at 22–23.)  "[T]he standards for evaluating . . .

retaliation claims are identical under Title VII and the NYSHRL." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271 n.3 (2d Cir. 2016) (quoting *Kelly v. Howard I. Shapiro & Assoc. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013)). "To make out a prima facie case of retaliation, a plaintiff must make four showings: that '(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Nieblas-Love v. N.Y. City Hous. Auth.*, 165 F. Supp. 3d 51, 69–70 (S.D.N.Y. 2016) (quoting *Summa*, 708 F.3d at 125). The elements of a prima facie case of retaliation under the NYCHRL are identical, "except that the plaintiff need not prove any 'adverse' employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Id.* at 70 (quoting *Leon v. Columbia Univ. Med. Ctr.*, No. 11 Civ. 8559, 2013 WL 6669415, at *12 (S.D.N.Y. Dec. 17, 2013)) (internal quotation marks omitted).

Defendant contends that Plaintiff has failed to establish two of the four elements of her prima facie case: (1) protected activity, and (2) adverse employment action under the NYSHRL (and action reasonably likely to deter her from protected activity under the NYCHRL).

First, Defendant argues that Plaintiff complained about only its handling of the first incident and Morris' and McCabe's conduct, none of which constituted "unlawful discrimination." (Dkt. No. 68 at 15.) It is true that "complaining of conduct other than unlawful discrimination is not a protected activity subject to a retaliation claim under the State and City Human Rights Laws," *Pezhman v. City of New York*, 851 N.Y.S.2d 14, 16 (N.Y. App. Div 1st Dep't 2008), but a plaintiff in a retaliation case "need not establish that the conduct he opposed was *in fact* a violation of [the NYSHRL and NYCHRL]." *Manoharan v. Columbia Univ. Coll.*

*of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (emphasis added). Instead, "[t]he plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Id.* (quoting *Abel v. Bonfanti*, 625 F.Supp. 263, 267 (S.D.N.Y. 1985) (quotation marks omitted))

Plaintiff has satisfied her burden of production to show that she engaged in protected activity. Plaintiff testified that she complained to McManus several times about Defendant's handling of the first incident of customer harassment. (Pl.'s CSOF ¶ 143; Dkt. No. 71-3, at 61; Dkt. No. 69-1, at 179.) As explained above, Defendant had a duty to take remedial action to correct customer harassment under federal, state, and city antidiscrimination laws. The Court cannot say, as a matter of law, that Plaintiff lacked a good faith, reasonable belief that Urban Outfitter's had failed to satisfy these legal obligations when she complained to management about the first incident.

Plaintiff also engaged in protected activity when she complained to McManus about McCabe's aggressive conduct after the first incident. (*Id.* ¶ 47.) His conduct included backing her up "against . . . a cash register," invading her "personal space," staring "right into her eyes," calling her a "stupid bitch," and "whispering through his teeth in an aggressive manner" that he would not be there to help her next time. (Pl.'s CSOF ¶ 46.) Again, the Court cannot conclude that Plaintiff did not reasonably hold a good faith belief that this conduct amounted to harassment on the basis of sex. *Cf. Cruz*, 202 F.3d at 571 (holding that Plaintiff satisfied burden to demonstrate severe or pervasive harassment where supervisor repeatedly invaded personal space and backed her against a wall). The Court concludes that Plaintiff has adduced sufficient evidence that she engaged in protected activity.

Defendant also contests the third element, arguing that it neither subjected Plaintiff to adverse employment action under the NYSHRL, nor took action reasonably likely to deter her from protected activity under the NYCHRL. Antidiscrimination laws "protect[] an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). To satisfy the "adverse employment action" prong under the NYSHRL (the stricter of the two laws at issue here), "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The Supreme Court has further explained that a "reassignment of job duties," though "not automatically actionable," may constitute materially adverse action: "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Id.* at 71 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Plaintiff argues that her reassignment to work in the back stock, among other things,[12] constituted an adverse employment action for retaliation purposes. Based on the evidence, a jury

---

[12]    Plaintiff points to several other purported materially adverse actions, including the fact that she was scheduled for night shifts and stopped receiving positive feedback from management. (Dkt. No. 71 at 24–25.) She also claims that McCabe's increasingly aggressive conduct towards her constituted materially adverse action. Because the Court concludes that her reassignment alone is sufficient to satisfy the adverse action element for purposes of summary judgment, it need not decide whether any of these other actions were also independently sufficient to satisfy that element. The Court notes, however, that an employer may be held liable for the retaliatory acts of a non-supervisory employee under the "cat's paw" theory of liability. *See Vasquez*, 835 F.3d at 273–74 (noting that employers can be liable "when, through its own negligence, the employer gives effect to the retaliatory intent of one of its—even low-level— employees").

could reasonably conclude that the prospect of reassignment to back-stock duties would have dissuaded a reasonable worker from complaining about discriminatory conduct. *See id.* (holding that reassignment from forklift operator to track laborer duties sufficient to constitute adverse action, where evidence indicated "track laborer duties were 'by all accounts more arduous and dirtier'"; that the "forklift operator position required more qualifications, which is an indication of prestige"; and that "the forklift operator position was objectively considered a better job"); *see also Hicks v. Baines*, 593 F.3d 159, 169 (2d Cir. 2010) (concluding that evidence that defendant "intentionally adjusted shift times, break times, work locations, and work assignments" was sufficient to survive summary judgment as to adverse action element of retaliation claim); *Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 34 (App. Div. 1st Dep't 2009) ("It is certainly possible for a jury to conclude that someone would be deterred from making a complaint if knowing that doing so might result in being assigned to duties outside or beneath one's normal work tasks.").

The evidence indicates that assignment to the back stock was generally perceived to be undesirable and even punitive. Plaintiff testified that the back stock was "the most undesirable place to be because it was freezing." (Dkt. No. 69-1, at 259.) Moreover, upon her reassignment, another employee asked Plaintiff "what she had done" to deserve the reassignment. (*Id.* at 143.) Finally, Plaintiff testified that she had no training in back-stock tasks. (*Id.* at 259.) "Based on this record, a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee." *Burlington N. & Santa Fe Ry.*, 548 U.S. at 71.[13]

---

[13] Because Plaintiff's evidence is sufficient to meet the materially adverse action test under the NYSHRL, it also satisfies the more permissive NYCHRL standard.

Defendant does not meaningfully challenge the remaining elements of Plaintiff's prima facie case of retaliation, i.e., Defendant's awareness of the protected activity and the causal connection between that activity and the adverse action.[14]  Accordingly, Defendant's motion for summary judgment is denied as to Plaintiffs' retaliation claims.

### C.    Constructive Discharge

Plaintiff also claims that she was constructively discharged in violation of the NYSHRL and the NYCHRL.  To succeed on a claim for constructive discharge, a plaintiff must demonstrate that her employer intentionally engaged in discriminatory conduct that forces her to quit involuntarily.  *See Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 185 (2d Cir. 2011); *Creacy*, 2017 WL 1216580, at *11.  "The inquiry is objective:  Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 261–62 (S.D.N.Y. 2014) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 130 (2004)).  "Work conditions are 'intolerable' if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Id.* at 262.  This standard is even more demanding than that required to prevail on a hostile environment claim.  *Id.*  In addition, the  Second Circuit requires a showing of intent in a constructive discharge claim: a plaintiff must establish that "there remains a genuine issue of material fact as to whether a defendant acted deliberately in engaging in conduct

---

[14]    Defendant briefly argues that Plaintiff failed to establish the second element of her claim, i.e. awareness of her complaints, but its argument is wholly contingent on its contention that Plaintiff "did not participate in any protected activity" at all.  (Dkt. No. 68 at 16.) For the reasons given above, the Court rejects the argument that Plaintiff did not participate in protected activity as a matter of law.

Similarly, Defendant contends that Plaintiff cannot establish the fourth element, causation, as a matter of law because she has not established either engagement in protected activity or adverse employment action.  The Court disagrees, as explained above, that Plaintiff has failed to establish adverse employment action as a matter of law.

that created the workplace conditions at issue" in order to survive summary judgment. *Creacy*, 2017 WL 1216580, at *12.

Plaintiff claims that she was constructively discharged because: (1)"the retaliation was escalating"; (2) "she was being forced to work the night shift and was afraid to leave work at 2:00 a.m. because of the customer harassment"; (3) "she was scared that another perpetrator could do something to her and Urban Outfitters wouldn't call the police"; and (4) "McCabe was making her feel powerless." (Dkt. No. 71.) But even if these work conditions were so unpleasant as to be objectively intolerable, Plaintiff's constructive discharge claim fails because there is no evidence that Defendant deliberately created these conditions. Regardless of whether Defendant's response to the customer harassment was incomplete or even negligent, there is no evidence that it sought to create an intolerable environment. To the contrary, the undisputed facts indicate that Defendant ejected both offending customers from the Store upon learning of their harassing conduct. (Pl.'s CSOF ¶¶ 28, 86).

Similarly, to the extent that McCabe's conduct contributed to Plaintiff's decision to resign, there is no indication that Defendant deliberately intended that outcome. Again, even if Defendant's response to Plaintiff's complaints about McCabe was inadequate, McManus responded that he is "a young boy; he doesn't know how to keep his emotions to himself and in check, like; let me go mother him." (Pl. CSOF ¶ 103.) While McManus's lack of further action may very well have been negligent, it cannot, without more evidence, be considered a deliberate attempt to subject Plaintiff to intolerable working conditions.[15] Moreover, there is no evidence that Plaintiff complained to management about McCabe's four allegedly invasive searches of her

---

[15]     The Court also notes that McCabe's conduct, although inappropriate and aggressive, likely does not satisfy the high "objectively intolerable" conditions standard for constructive discharge. *See Pryor*, 992 F. Supp. 2d at 261–62.

person.  *Cf. Creacy* 2017 WL 1216580, at *12 (concluding that plaintiff introduced sufficient evidence of employer's deliberate failure to take any action, where it failed to ban a repeated harasser from the store and failed to investigate incidents of customer harassment as required by its policy).

Because there is insufficient evidence in the record to establish a genuine issue of fact as to whether Defendant deliberately created intolerable working conditions, the motion for summary judgment on Plaintiff's constructive discharge claim is granted.

## IV.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED in part and DENIED in part.  Specifically, summary judgment is granted in favor of Defendant as to (1) Plaintiff's constructive discharge claim and (2) Plaintiff's claim based on customer harassment under the NYSHRL.  Summary judgment is denied as to all other claims.

Counsel for the parties shall confer regarding trial dates and shall, on or before January 5, 2018, submit a joint letter proposing trial dates between February and June of 2018.

The Clerk of Court is directed to close the motion at Docket Number 67.

SO ORDERED.

Dated:  December 18, 2017
        New York, New York

J. PAUL OETKEN
United States District Judge